**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| **DEREK WHEELING BURNETT,** | |
| PLAINTIFF | |
| v. | **CASE NO.** |
| **BLUEFORCE, INC** | |
| DEFENDANT. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff, Dr. Derek Wheeling Burnett ("Burnett" or "Plaintiff"), and submits the following Complaint against Defendant BlueForce, Inc. ("BlueForce" or "Defendant").

## PRELIMINARY STATEMENT

1.      This is an action for race and religious discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, as well as for failure to accommodate a disability under Title II of the Americans with Disabilities Act (the "ADA").

## PARTIES

2.      Burnett is an individual domiciled in Pennsylvania.

3.      BlueForce is a stock corporation organized under Virginia law with a principal place of business located in Hampton, Virginia. BlueForce is engaged in an industry affecting commerce and employs more than 500 employees worldwide.

## JURISDICTION & VENUE

4.      This Court has subject matter jurisdiction over Burnett's claims pursuant to 28

1

U.S.C. § 1331.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because BlueForce maintains and administers the employment records relevant to this action in its principal office located in Hampton, Virginia.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6.      On November 22, 2017, Burnett filed a charge of discrimination against BlueForce with the Equal Employment Opportunity Commission ("EEOC") asserting claims of race, religion, and disability discrimination, as well as retaliation under Title VII and the ADA.

7.      On September 3, 2020, the EEOC issued to Burnett a Notice of Right to Sue on his Title VII and ADA claims.

8.      Accordingly, Burnett has exhausted his administrative remedies with respect to these claims under 42 U.S.C. §§ 17117 and 2000e-5.

**FACTUAL ALLEGATIONS**

**The English Language Training Program at BlueForce**

9.      BlueForce is an international defense contractor based out of Hampton, Virginia that provides an assortment of training, technical, and security services to government and commercial entities.

10.      In or around November 2015, BlueForce entered into a contract (the "Contract") with the United States Airforce Air Combat Command (the "ACC") to provide certain services to the ACC, including English Language Training ("ELT") to international military students in the Suadi Arabian Royal Saudi Air Force.

11.      The ELT provided by BlueForce under the Contract, also known as Task Order SK04, was part of a multi-phased program (the "ELT Program") whereby BlueForce trained

international military students initially in the Kingdom of Suadi Arabia, ("KSA") after which they would be sent to the United States to continue their training with the ultimate objective of providing technical services to the United States Air Force.

12.     Under KSA law, American companies must either be licensed to conduct business in KSA or sponsored by another entity that is authorized to conduct business in KSA. Because BlueForce was not independently authorized to operate in KSA, it partnered with the Middle East Branch of S&K Aerospace, LLC ("S&K"), an American entity that holds a Saudi Commercial Business License, to perform ELT under the Contract.  BlueForce used S&K as both a sponsor and a subcontractor to conduct Task Order SK04.

13.     As a matter of practice and policy, the KSA government typically insulates itself from foreign competition and therefore issues very few business licenses to American entities. As such, BlueForce's relationship with S&K, as well as KSA, was uniquely valuable to BlueForce.

**Burnett's Employment at BlueForce**

14.     Dr. Burnett is a veteran of the United States Army with a Masters' degree in Education, Curriculum, and Instructions and a Doctorate in Education, Leadership, and Change. He also holds a Teaching English as a Foreign Language ("TEFL") Certificate from the TEFL Academy; an American Language Certificate from the Defense Language Institute; and an Information Technology Certificate from LaSalle University.

15.     Burnett has extensive experience working with educational institutions in KSA. Prior to joining BlueForce, Burnett worked as a Human Resources Coordinator for King Saud University in Riyadh; a Learning Resources Manager for Riyadh Schools; and a Training Consultant for Saudi Electric Services Polytechnic.  Burnett has also published extensively on topics related to ELT or education generally in Saudi Arabia.

16.     On or about July 10, 2016, Burnett was hired by Blueforce as an ELT Instructor in KSA as part of Task Order SK04.

17.     As an ELT Instructor, Burnett was responsible for training several classes of international military students. Among other things, Burnett was required to make recommendations on ELT curriculum design, develop and familiarize himself with ELT curriculum, teach courses, prepare exams, and advise BlueForce on the placement and training needs of the international military students.

18.     ELT Instructors worked as part of a hierarchy of positions under the Blueforce ELT program. This hierarchy, in ascending order of seniority, included ELT Instructors, Senior ELT Instructors, an ELT Deputy, an Academic Director, a Chief Learning Resource, and a Project Manager.

19.     When Burnett first accepted his position at BlueForce, he had been advised that there would be opportunities for promotions to more senior positions with expanded supervisory roles and higher wages. Accordingly, Burnett poured himself into his work at BlueForce with this aim in mind. He quickly earned a reputation among his peers and supervisors as being diligent, professional, and a reliable source of advice and information.

### Les Lunceford's Role at Blueforce

20.     At all relevant times, Les Lunceford was the Project Manager for BlueForce's operations in KSA.

21.     Unlike Burnett and other members of the ELT team in KSL, Lunceford did not have a background in academia. Rather, the bulk of his work experience had been in executive level positions for commercial entities.

22.     As Project Manager, Lunceford essentially oversaw the entire Task Order SK04

operation.

23.     Moreover, because BlueForce's headquarters was in the United States, it did not have a centralized human resources department in KSA. As such, Lunceford played a significant role in personnel decisions for the ELT Program in KSA.

24.     Given the unique relationship that BlueForce held with S&K and Saudi Arabia, Lunceford was particularly sensitive to what he perceived to be certain Saudi social and cultural expectations. In particular, Lunceford believed that the Saudis would not approve of placing non-Arabic Muslims in senior management positions.

25.     Accordingly, Lunceford developed a reputation for discriminating against black Muslims at BlueForce.

26.     Upon information and belief, Lunceford never promoted black Muslims at BlueForce, and he routinely terminated—or otherwise caused to be terminated—black Muslims.

27.     In addition, Lunceford had a reputation for discriminating against black employees generally at BlueForce. Indeed, during his entire tenure at BlueForce, only one black employee out of approximately 70 employees in Task Order SK04 held a supervisory position. This was true despite the fact that multiple ELT Instructors were black and had sought promotions at BlueForce during Lunceford's tenure as the Project Manager.

28.     In contrast to his treatment of black Muslims, Lunceford routinely promoted other, less qualified, white BlueForce employees to senior supervisory roles.

29.     For example, Seth Holton, one of Burnett's colleagues, was promoted to a supervisory position while Burnett was at BlueForce despite the fact that Holton had only a masters' degree while Burnett had both a masters' and a doctorate.

**Lunceford passes over Burnett for several promotions**

30.     In late 2016, shortly after Burnett started his job at BlueForce, several supervisors—all of whom were white—departed Task Order SK04, which left a series of vacant positions available. These positions included a Senior ELT Instructor, an Academic Director, and a Chief Learning Resource.

31.     Upon learning about the vacancies, Burnett applied for each of the open positions.

32.     Given his education, experience, and extensive background in ELT, Burnett was overwhelmingly qualified for each of the open positions.

33.     Moreover, the former Academic Director personally recommended that Burnett fill his position upon his departure.

34.     Despite Burnett's qualifications and the recommendation of his predecessor, Lunceford elected not to offer any of the open positions to Burnett. Instead, Lunceford filled each of these positions with white, non-Muslim men.

35.     Moreover, each of the men who Lunceford selected to fill the open positions was demonstrably less qualified than Burnett, as none of the men selected for the vacant positions held Doctorate degrees, and they each had less experience than Burnett in the field of ELT.

**Burnett proposes a new position to Lunceford**

36.     In or around early 2017, a government Contracting Officer's Representative ("COR")—an individual responsible for evaluating whether the government should renew the Contract with BlueForce—approached Burnett individually to inform him about deficiencies in the ELT Program that needed to be corrected before the Contract could be renewed.

37.     Based on the COR's recommendations, Burnett prepared a Project Proposal (the "Proposal") to resolve certain deficiencies and inefficiencies in the ELT Program.

38.     Among other things, the Proposal contemplated that Burnett would be promoted to a newly created "Program Coordinator" position whereby he would act as a liaison between various supervisory positions in the ELT department, including the Project Manager, the Academic Director, and the ELT Deputy.

39.     The proposed Program Coordinator position would entail both increased responsibility for Burnett as well an increase in pay commensurate with his new duties.

40.     Given his background and experience, Burnett was overwhelming qualified for the Program Coordinator position.

41.     In May 2017, Burnett first submitted the Proposal to Lunceford via email.

42.     At the time Burnett submitted the Proposal, he had already met Lunceford in person; however, upon information and belief, Lunceford did not recall Burnett specifically or remember that he was a black Muslim male. To be sure, Lunceford routinely confused the names of black employees at BlueForce, and on at least one occasion Lunceford had confused Burnett with another BlueForce instructor.

43.     Days after receiving the Proposal, Lunceford responded to Burnett's email stating that he approved of the project and that Burnett should begin working out the details. Lunceford copied Robert Young, Lunceford's supervisor in the United States, on the email.

44.     In the following weeks, Burnett began to work out details of the proposal, per Lunceford's instructions. Among other things, Burnett designed curriculum, developed webinars, and coordinated with others on the academic team. During this time, Lunceford sent out emails to coordinate with Burnett and others on the academic team about implementing the Proposal.

**Burnett meets with Lunceford in person**

45.     In July 2017, after Burnett had completed a significant amount of work on the

Proposal, Burnett met with Lunceford in person to discuss his progress.

46.     At this meeting, Lunceford first made the connection that the individual who had submitted the Proposal—with whom Lunceford had been corresponding by email for several weeks—was a black Muslim male.

47.     Lunceford's attitude toward the Proposal changed instantly. Lunceford told Burnett that there was "no way in hell" that their "client"—apparently a reference to S&K or perhaps KSA more generally—would allow a black Muslim to be in a senior leadership position. When Burnett pushed back, Lunceford began to spew racially-charged vulgarities at Burnett, telling him that he was a "crazy black son of a bitch," that he was from "slave descendants," that "Martin Luther King is dead," and that BlueForce's policy does not require equal opportunity in Saudi Arabia.

48.     Ultimately, Lunceford told Burnett that he would not endorse him for the promotion or grant him a request for security clearance for any employment advancement.

49.     After this conversation, Lunceford effectively withdrew his endorsement of the Proposal and refused to establish a Project Coordinator position or to promote Burnett into such a position.

**BlueForce refuses to Accommodate Burnett's disability**

50.     In or around June 2017, Burnett visited a doctor in KSA concerning ongoing problems with Osteoarthritis in both of his knees.

51.     Prior to this visit, Burnett had informed Lunceford and others at BlueForce about his Osteoarthritis, as well as about his PTSD.

52.     During his visit, Burnett's doctor advised him that to effectively manage his Osteoarthritis, Burnett would need to sit with his legs elevated periodically throughout the day.

53.     The doctor's advice was inconsistent with Burnett's traditional work schedule,

which required that he stand to lecture classes for extended periods on most days.

54.     Shortly after his visit to the doctor, Burnett approached Bruce Feldman, his immediate supervisor, to request an accommodation for his Osteoarthritis. Burnett proposed that he be permitted to sit periodically during lectures or that his job be modified in some other way such that he could comply with his doctor's recommendation.

55.     Nothing about the essential functions of Burnett's position at that time necessitated that he remain standing for the entirety of his lectures.

56.     Furthermore, BlueForce could accommodate Burnett in other ways, such as by transferring him to a position in the library, where he could perform the essential functions of his job without needing to lecture throughout the day.

57.     Upon information and belief, Feldman approached Lunceford about Burnett's request for an accommodation. Lunceford told Feldman that it was not Lunceford's problem and denied Burnett's request for an accommodation.

58.     Thereafter, Burnett was forced to endure significant pain and aggravate his Osteoarthritis by standing for the entirety of his lectures.

**Lunceford arbitrarily withholds leave approval from Burnett**

59.     Per KSA labor law, with which BlueForce was required to comply, employees are entitled to a minimum of 21 days of paid leave annually. KSA law also requires that employees be entitled to at least three days of bereavement leave.

60.     Moreover, BlueForce's Employee Handbook provides that the company may, in its discretion, allow employees to be on leave without pay ("LWOP") for up to 90 days. The Handbook provides, however, that employees must exhaust their paid leave before using LWOP.

61.     BlueForce's Employee Handbook also explicitly allows employees to take leave

for other reasons, including, but not limited to, jury duty.

62.     Upon information and belief, BlueForce employees who were white or who were otherwise not black Muslims were always permitted to use paid annual leave. For example, Lunceford allowed James Brown, Brian Malovany, and John Wiley—white ELT Instructors at BlueForce—to take paid leave around this time.

63.     Moreover, upon information and belief, BlueForce employees who were white or who were otherwise not black Muslims were regularly granted LWOP on request.

64.     In August 2017, Burnett requested bereavement leave to travel to the United States following the death of his brother, as well as additional leave to manage and seek treatment for exacerbated symptoms that he was experiencing related to his Post Traumatic Stress Disorder ("PTSD") as well as ongoing symptoms from Osteoarthritis in his knees.

65.     At the time Burnett requested leave in August 2017, he had not exhausted any leave during that calendar year, paid or otherwise.

66.     In response to Burnett's leave request, Lunceford granted Burnett six days of leave without pay, as well as five days of bereavement leave, which he specified on the leave form was "with pay per KSA rules." The form indicated that Burnett would be on leave from August 10, 2017 to August 24, 2017, which totaled 11 weekdays.

67.     Lunceford did not explain in the leave form why he was requiring Burnett to use unpaid leave, contrary to company policy.

68.     On or about August 6, 2017, Burnett contacted a representative from BlueForce in the United States and informed them about his experiences at BlueForce up to that point and advised them that the felt he was being discriminated against on the basis of his race and religion. Burnett followed up with BlueForce on or about August 15, 2017 and reiterated these same

concerns. Upon information and belief, BlueForce representatives in the United States communicated Burnett's concerns to Lunceford.

69.     While on leave, Burnett continued to have problems with both his PTSD and his Osteoarthritis. Accordingly, he contacted BlueForce's human resources department and requested an extension of his leave time to September 11, 2017 so that he could continue to seek treatment for his symptoms.

70.     Out of the additional leave time that Burnett requested, the vast majority (specifically, August 27 to September 7) took place during the summer break for the ELT Program, which did not count against his accrued paid leave time. Accordingly, Burnett effectively requested only three days of paid leave.

71.     BlueForce granted Burnett's request for paid leave until September 11, 2017.

72.     Unfortunately, Burnett continued to face problems with his knees such that his doctor scheduled him for surgery. He was also selected for jury duty. Therefore, on or about September 8, 2017, Burnett sent a text message directly to Lunceford requesting additional leave to, inter alia, accommodate his need to undergo surgery and allow him to attend jury duty.

73.     At the time of this request, Burnett had been granted a total fourteen days leave, which included 8 days of paid leave and 6 days of LWOP. Per Saudi law and BlueForce policy, Burnett was entitled to at least an additional 12 days of paid leave and, in BlueForce's discretion, an additional 84 days of LWOP.

74.     Despite these provisions, Lunceford declined to grant Burnett's request for additional leave.

75.     On September 11, 2017, Lunceford emailed Burnett demanding to know why he had not returned to KSA. Lunceford advised Burnett that he had not obtained approval for LWOP.

76.     Burnett responded to Lunceford's email and explained, as he had in his text message, that he needed leave for, inter alia, a medical procedure and jury duty.

77.     On September 29, 2017, the BlueForce HR director emailed Burnett stating that Burnett was currently on unapproved LWOP and that without the proper documentation, BlueForce would need to consider termination.

78.     Burnett ultimately provided BlueForce with the requested documentation.

**Burnett is antagonized by Lunceford and constructively discharged from BlueForce**

79.     Given Lunceford's pattern of hostile and discriminatory behavior toward him, Burnett reasonably feared that further adverse action by BlueForce was inevitable.

80.     Burnett also knew that if he was terminated or even formally reprimanded by BlueForce, it could jeopardize his opportunities to continue as an ELT with any employer in KSA. Indeed, sponsorship from an employer was a necessary prerequisite for him to live and work in any capacity in KSA, as he had for the prior six years. Accordingly, if other employers in KSA were to learn that he had been terminated, they would be substantially less likely to offer him sponsorship.

81.     In early October 2017, Burnett contacted the Blueforce HR department requesting that it approve a transfer of his sponsorship and advised HR that a letter requesting sponsorship from a new sponsor would be forthcoming.

82.     On or around October 4, 2017, Burnett returned to KSA. At that time, Burnett was in the process of trying to obtain employment as an ELT exclusively with S&K and requesting information about the transfer of his sponsorship.

83.     On October 6, 2017, Burnett submitted a letter to Lunceford stating that he was formally resigning from his position at BlueForce effective October 15, 2017.

84.     Lunceford acknowledged receipt of Burnett's letter on October 11, 2017.

85.     On October 10, 2017, Burnett emailed the HR department for S&K asking if they might be able to send a request to BlueForce for a transfer of his sponsorship to S&K. On that same day, S&K approved the request but noted that they would also need approval from BlueForce.

86.     Upon information and belief, BlueForce began to disparage Burnett in an apparent attempt to undermine his efforts to be sponsored by another entity in KSA. Specifically, in an email dated October 12, 2016, Robert Young—Lunceford's supervisor in the United States—emailed an S&K representative stating that Lunceford told Young that Burnett was a "nut job."

87.     Unsurprisingly, S&K ultimately declined to allow Burnett to transfer his sponsorship to their company.

## COUNT I—DISPARATE TREATMENT ON THE BASIS OF RACE AND RELIGION
### (Title VII of the Civil Rights Act of 1964)

88.     Burnett incorporates the preceding paragraphs by reference.

89.     BlueForce is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

90.      At all relevant times, Burnett was an "employee" of BlueForce within the meaning of 42. U.S.C. § 2000e(f).

91.     Burnett is a black and Muslim male.

92.     Burnett consistently performed his job at BlueForce at a level that met or exceeded BlueForce's expectations.

93.     Notwithstanding Burnett's performance, BlueForce took a series of adverse employment actions against Burnett. These adverse actions included, without limitation, i) refusing to promote Burnett to positions to which he was qualified, ii) refusing to accommodate Burnett's request for a moderate accommodation for his Osteoarthritis, iii) making disparaging

13

remarks about Burnett that compromised his ability to transfer his sponsorship to S&K, iv) refusing to authorize leave to which Burnett was entitled, and v) constructively terminating Burnett from his position at BlueForce.

94.     BlueForce took the above-described adverse actions against Burnett on the basis of his race and religion.

95.      BlueForce's actions were intentional and with malice or otherwise reckless indifference to Burnett's right to be free from racial and religious discrimination in his employment.

96.     As a direct result of BlueForce's unlawful discrimination, BlueForce has suffered substantial damages.

## COUNT II—DISPARATE TREATMENT ON THE BASIS OF RACE
### (42 U.S.C. § 1981)

97.     Burnett incorporates the preceding paragraphs by reference.

98.     Burnett consistently performed his job at BlueForce at a level that met or exceeded BlueForce's expectations.

99.     Notwithstanding Burnett's performance, BlueForce took a series of adverse employment actions against Burnett. These adverse actions included, without limitation, i) refusing to promote Burnett to positions to which he was qualified, ii) refusing to accommodate Burnett's request for a moderate accommodation for his Osteoarthritis, iii) making disparaging remarks about Burnett that compromised his ability to transfer his sponsorship to S&K, iv) refusing to authorize leave to which Burnett was entitled, and v) constructively terminating Burnett from his position at BlueForce.

100.     But for Burnett's race, BlueForce would not have taken the above-described actions

14

against Burnett.

101.    Furthermore, BlueForce's actions were intentional and with malice or otherwise reckless indifference to Burnett's right to be free from racial discrimination in his employment.

102.    As a direct result of BlueForce's unlawful discrimination, BlueForce has suffered substantial damages.

**COUNT III—RETALIATION**
**(Title VII of the Civil Rights Act of 1964)**

103.    Burnett incorporates the preceding paragraphs by reference.

104.    Burnett engaged in protected activity under Title VII when he complained to BlueForce about discrimination on the basis of race and religion including, without limitation, the occasions identified in Paragraph 73.

105.    BlueForce took a series of materially adverse employment actions against Burnett for engaging in protected activity, including, without limitation, i) refusing to authorize leave to which Burnett was entitled, ii) making disparaging remarks about Burnett that compromised his ability to transfer his sponsorship to S&K, and iii) constructively terminating Burnett from his position at BlueForce.

106.    BlueForce's actions were intentional and with malice or otherwise reckless indifference to Burnett's right to be free from retaliation under 42 U.S.C. § 2000e-3.

107.    As a direct result of BlueForce's retaliatory actions, Burnett has suffered substantial damages.

**COUNT IV—RETALIATION**
**(42 U.S.C. § 1981)**

108.    Burnett incorporates the preceding paragraphs by reference.

109.    Burnett engaged in protected activity under 42 U.S.C. § 1981 when he complained

to BlueForce about discrimination on the basis of race including, without limitation, the occasions identified in Paragraph 73.

110.    BlueForce took a series of materially adverse employment actions against Burnett for engaging in protected activity, including, without limitation, i) refusing to authorize leave to which Burnett was entitled, ii) making disparaging remarks about Burnett that compromised his ability to transfer his sponsorship to S&K, and iii) constructively terminating Burnett from his position at BlueForce.

111.    But for Burnett's race, BlueForce would not have taken the retaliatory adverse actions against Burnett.

112.    Furthermore, BlueForce's actions were committed intentionally and with malice or otherwise reckless indifference to Burnett's right to be free from retaliation under 42 U.S.C. § 1981.

113.    As a direct result of BlueForce's retaliatory actions, Burnett has suffered substantial damages.

### COUNT V—FAILURE TO ACCOMMODATE DISABILITY
#### (Americans with Disabilities Act)

114.    Burnett incorporates the preceding paragraphs by reference.

115.    BlueForce is a "covered entity" within the meaning of 42 U.S.C. § 12111.

116.    At all relevant times, Burnett was a qualified individual with a disability within the meaning of 42 U.S.C. §§ 12102 and 12111.

117.    In or around June 2017, Burnett requested a reasonable accommodation from BlueForce for his Osteoarthritis by asking that he be permitted to periodically sit and elevate his legs during the day.

118.    Notwithstanding Burnett's request, BlueForce refused to engage in an interactive

16

process and ultimately denied his request for an accommodation.

119.    Furthermore, in or around August and September 2017, Burnett submitted multiple requests to BlueForce to reasonably accommodate his PTSD and Osteoarthritis by asking that he be permitted to take leave to manage symptoms and seek treatment for each of these conditions.

120.    Notwithstanding Burnett's requests, BlueForce refused to engage in an interactive process and, on multiple occasions, denied his request for an accommodation.

121.    BlueForce's actions were intentional and with malice or otherwise reckless indifference to his right to reasonable accommodations for his disabilities under 42 U.S.C. § 12112.

122.    As a direct and proximate result of BlueForce's denial of Burnett's request for an accommodation, Burnett suffered substantial damages.

## PRAYER FOR RELIEF

123.    WHEREFORE, Burnett respectfully requests that the Court entered judgment in his favor granting him legal and equitable relief as the Court may deem just, including, but not limited to

a.    front and back pay;

b.    compensatory damages;

c.    punitive damages;

d.    liquidated damages;

e.    reasonable attorneys' fees and costs; and

f.    any other relief to which Burnett is entitled by law and to which the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff Derek Burnett demands a trial by jury on all triable issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: December 2, 2020

Respectfully submitted,

_____/s/_____
Ben D. Johnson (VSB No. 90812)
PIERCE MCCOY, PLLC
313 East Broad St., Suite 315
Richmond, Virginia 23219
Tel: 804-413-4021
Fax: (757) 257-0387
bjohnson@piercemccoy.com

Joshua L. Jewett (VSB No. 76884)
PIERCE MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, Virginia 23510
Tel: (757) 901-4382
Fax: (757) 257-0387
jjewett@piercemccoy.com

*Counsel for Plaintiff Derek Burnett*